U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*[signature]*

**United States Bankruptcy Judge**

**Signed April 25, 2012**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| BROUGHTON LTD. PARTNERSHIP, | § | CASE NO. 10-42327-DML11 |
| | § | |
| OLD GROVE LTD. PARTNERSHIP, | § | CASE NO. 10-42328-DML11 |
| | § | |
| BROADLAND LTD. PARTNERSHIP, | § | CASE NO. 10-42329-DML11 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |

**MEMORANDUM OPINION AND ORDER**

Before the court is the *Amended First and Final Application for Allowance of Special Counsel's Fees* (the "Application"), at docket no. 689, filed by Attorney Mark B. French on behalf of Cotten Schmidt & Abbott (the "Firm") for work done principally by Randall Schmidt ("Schmidt") as special counsel to the above-named debtors ("Debtors," and, respecting

1

Broughton Ltd. Partnership, "Broughton") during their time as chapter 11 debtors in possession. The United States trustee (the "UST") filed an objection to the Application (the "Objection"), and the court considered the Application and Objection during a hearing held on January 30, 2012 (the "Hearing"). During the Hearing, the court heard testimony from Schmidt and Debtors' attorney, St. Clair Newbern III ("Newbern"), and received into evidence exhibits identified as necessary below. At the court's invitation, the Firm and the UST filed supplemental briefs following the Hearing.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(A). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P.7052 and 9014.

## I. Background

These cases were commenced by the filing of voluntary petitions under chapter 7 of the Bankruptcy Code (the "Code")[1] on April 5, 2010. Shortly after filing their petitions, on June 1, 2010, Debtors filed motions to convert the cases to cases under chapter 11 of the Code. On June 28, 2010, the court entered its order granting that motion. As a result of the conversion of the cases, the trustees appointed in the chapter 7 cases were automatically terminated. Code § 348(e). The Debtors then assumed responsibility as the representatives of their estates. Code § 1107.

Debtors' business was the development of high-end residential subdivisions and sales of the developed lots. Because of various currents in the national economy, Debtors were unable to sell sufficient lots to service their debt, and the filing of these bankruptcy cases became necessary.

---

[1] 11 U.S.C. §§ 101 *et seq.*

2

In late 2010, in furtherance of their efforts to reorganize, Debtors located a prospective buyer, Standard Pacific of Texas, Inc. ("SPOT"), for 22 lots owned by Broughton. At that time, Debtors engaged, pursuant to an order of this court, the Firm and Schmidt as special counsel to negotiate a contract with SPOT.

Schmidt undertook his duties as special counsel[2] and over time attempted to negotiate a satisfactory contract with SPOT. SPOT, however, as a condition to the purchase of the 22 lots, required a release of certain claims asserted by the Colleyville Home Owners Rights Association, Inc. ("CHORA"). When Schmidt, acting for Broughton, and SPOT were unable to negotiate a satisfactory agreement with CHORA, SPOT declined to proceed with the purchase of the 22 lots, and, on February 24, 2011, the deal Schmidt was working on fell through.

Neither Schmidt nor the Firm thereafter performed work for Debtors, though Schmidt testified at a hearing held on March 8, 2011, regarding the failure to close the SPOT deal (Application at p. 4). Subsequently, on May 20, 2011, Debtors' chapter 11 cases were converted back to chapter 7 by the court, acting *sua sponte*, and trustees were appointed to sell the assets of Debtors, including all property of Broughton. The 22 lots that were the subject of the SPOT deal were subsequently sold at auction to another buyer; SPOT did not bid on the lots at the auction.

**II.    The UST's Objection**

---

[2]    The application to employ the Firm (the "Application to Employ") specified that it would:

> …be limited to the negotiation and closing of the contract for the sale of twenty-two (22) lots in the Broughton development and the review and amendment, if necessary, of the Broughton Development Covenants and Restrictions incident to the transfer of ownership of those lots and, if possible, the common areas, to the purchaser so that the purchaser of the lots becomes the new declarant/developer, and similar matters as may arise with the Broadland Ltd. Partnership and Old Grove Ltd. Partnership Chapter 11 cases.

(Application to Employ ¶ 5).

3

The UST initially objected to the Firm's fees on the basis that the Firm did not comply with the UST's guidelines in its original application. The court understands that the Application, as amended, resolves that problem.

The UST next objects to the Application on the basis that the Firm received a retainer of $10,000, $7,500 of which was paid by Debtors after commencement of these chapter 11 cases without court approval. Schmidt testified that he had been informed that the retainer the Firm was to receive would come from a non-debtor third party.[3] He further testified that he was unsure whether he had seen Debtors' $7,500 check to the Firm but that the check had been deposited into the Firm's IOLTA trust account.[4]

At the Hearing, the court directed the return to Debtors of the $7,500. Although this should have been done without court intervention as soon as Schmidt realized the Firm was holding funds advanced by Debtors without court approval, the court finds that Schmidt and the Firm acted in good faith. The court also finds that initially the Firm and Schmidt believed that the entire retainer held by the Firm was advanced by a nondebtor. The court therefore holds that the Firm should not be denied compensation based on Debtors' unauthorized payment to it, and the Objection, to the extent it is based on the retainer, will be overruled.

Next, the UST argues that Schmidt's work did not result in an "identifiable, tangible, and material benefit to the estate." These words are drawn from *Andrews & Kurth, L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distribs., Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998). *Pro-Snax* is generally viewed as requiring the court, from the vantage point of "the Monday after," to assess

---

[3] Transcript of the Hearing ("TR") at pp. 10, 19-20. Schmidt's testimony is supported by the fact that $2,500 of the $10,000 retainer did in fact come from a third party, Sister Initiative LLC, an affiliate of Debtor.

[4] TR at p. 11.

4

the benefits to the estate of a professional's work in awarding compensation.[5] Although the UST, in the Objection and in argument at the Hearing, argued *Pro-Snax* and did so, it seemed to the court, in terms of the need for a retrospective consideration of the Firm's efforts, in his post-Hearing brief, the UST asserts that the court need not engage in a retrospective analysis because Schmidt should have early recognized that no benefit was likely to accrue to Broughton's estate from pursuit of the SPOT deal. *See United States Trustee's Post-Hearing Brief* at p. 3.

The court does not agree with the UST. The proposed sale to SPOT was viewed in late 2010, not only by the court, but by the various parties, as the keystone of Debtors' potential reorganization. As Schmidt testified, he spent considerable time not only negotiating with SPOT

---

[5] All courts interpreting *Pro-Snax* have reached the conclusion that some sort of retrospective analysis is required. Lower courts have adopted differing views of what type of retrospective analysis should be employed and have disagreed whether a prospective analysis may be considered in determining whether *Pro-Snax* is satisfied. The court has identified three general approaches to interpreting *Pro-Snax*. *See In re Asarco LLC*, 2011 WL 2974957 at *22 (Bankr. S.D. Tex. Jul. 20, 2011). First, there are those courts that apply a pure hindsight test. *See In re Weaver*, 336 B.R. 115, 119 (Bankr. W.D. Tex. 2005) (stating that *Pro-Snax* clearly rejected a test that would take into account "whether the services were objectively beneficial at the time they were performed."); *Quisenberry v. Am. State Bank (In re Quisenberry)*, 295 B.R. 855, 865 (Bankr. N.D. Tex. 2003) (stating that *Pro-Snax* imposes an objective after-the-fact test, "regardless of the reasonableness of services at the time that [the services] were rendered.")

Second, some courts state that they apply a pure hindsight approach, but implicitly employ a prospective analysis. *See In re PricewaterHouseCoopers, LLP v. Litzler (In re Harbor Fin. Group, Inc.)*, 2001 WL 1041785, at *3-4 (N.D. Tex. Sep. 5, 2001); *In re JNS Aviation, LLC*, 2009 WL 80202, at *8 (Bankr. N.D. Tex. Jan. 9, 2009).

Third, some courts follow a "hybrid" approach that combines both prospective and retrospective analyses. *See In re Asarco LLC*, 2011 WL 2974957, at *22; *In re Cyrus II P'ship*, 2009 WL 2855725 (Bankr. S.D. Tex. Sep. 1, 2009); *In re Spillman Dev. Group, Ltd.*, 376 B.R. 543, 550-54 (Bankr. W.D. Tex. 2007). Courts applying the third approach have concluded that it better harmonizes with the language of section 330(a)(3)(C) of the Code, which states that the necessity and benefit of services should be measured "at the time at which the service was rendered." *See In re Asarco LLC*, 2011 WL 2974957, at *22. Some of the "hybrid" courts have also limited the practical effect of applying a hindsight test by stressing that a retrospective analysis does not require "success," but that compensation may be awarded for "first tries, mixed results and even failures" if those actions "ultimately advance[] the case." *Id.* at *22; *see also In re Cyrus II P'ship*, 2009 WL 2855725, at *16, 21 (stating that "[a] service may 'benefit the estate' under *Pro-Snax* even though the service did not directly result in a quantifiable or monetary benefit") (citation omitted). These courts have further opined that concluding that *Pro-Snax* allowed payment only for successful work would effectively, and impermissibly, force all professionals to work on a contingency-fee basis. *See Id.* at *10; s*ee also In re Asarco LLC*, 2011 WL 2974957, at *22.

5

respecting contract terms, but also attempting to resolve the problems with CHORA.[6] He believed, up until the time SPOT withdrew from the negotiations, that the transaction would close.[7] There certainly was no question about SPOT's interest in the 22 lots or its financial ability to purchase them. That the transaction was a difficult one to put together and that the idiosyncrasies of the parties might frustrate the efforts of counsel does not mean that counsel was required to cease work and give up. Rather, so long as a professional is doing its principal's bidding and there is a reasonable prospect of success,[8] the professional is entitled to work in the expectation of being paid. Based on the record before it, the court thus holds that "the services [of the Firm] were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, [the bankruptcy case]." *See* Code § 330(a)(3)(C).

### III. Identifiable, Tangible, and Material Benefit

The court's holding respecting the last-quoted portion of Code § 330(a)[9] means that Schmidt and the Firm have satisfied the "prospective" test for compensation set by the Code.

---

[6] TR at pp. 11-12.

[7] TR at pp. 13-14.

[8] In approving the sale to SPOT, the court implicitly accepted that the transaction accorded with Debtors' sound business judgment. Where that test is met and the transaction is not inherently flawed, as would have been the case if SPOT had not been financially sound, it would be unreasonable and inconsistent with a lawyer's duties to his or her client to require the Firm to second-guess Debtors' directions.

[9] Section § 330(a) states:

(a)
(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—
    (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
    (B) reimbursement for actual, necessary expenses.
(2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

However, the UST has urged that they have not provided an "identifiable, tangible, and material benefit to the estate" and so, under *Pro-Snax*, are not eligible for compensation. The court will accordingly address whether the Firm and Schmidt would be entitled to compensation for their work under *Pro-Snax*. In doing so, if the court concludes a benefit commensurate with the fees sought was provided, it need go no further to determine *Pro-Snax* has been satisfied.[10]

### A. *Pro-Snax*

In *Pro-Snax*, the Court of Appeals was faced with two questions. In that case, Andrews & Kurth, LLP ("A&K") represented the debtor first in response to an involuntary chapter 7 petition, next in an ensuing chapter 11 case and, finally, after appointment of a chapter 11 trustee. The questions the Court faced were, first, whether A&K could be compensated for work done after the trustee's appointment, and, second, what standard should be applied in determining A&K's compensation.

Most of the Court's opinion is devoted to the first of these questions. Based on the plain meaning of section 330(a)(1), the Court concluded that A&K could not be compensated for

---

(3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
    (A) the time spent on such services;
    (B) the rates charged for such services;
    (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
    (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
    (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
    (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.
(4)    (A) Except as provided in subparagraph (B), the court shall not allow compensation for—
        (i) unnecessary duplication of services; or
        (ii) services that were not—
            (I) reasonably likely to benefit the debtor's estate; or
            (II) necessary to the administration of the case…

[10]    This is consistent with the general rule that an estate must receive fair value post-petition.

services rendered to the debtor after appointment of the trustee. Though courts had come down on both sides of this issue, the Supreme Court ultimately resolved it in the same way as did the *Pro-Snax* court in *Lamie v. U.S. Tr.*, 540 U.S. 526, 531, 124 S.Ct. 1023, 1029, 157 L.Ed.2d 1024 (2004), which cites *Pro-Snax* with approval.

As to the second issue, the one germane to the court's consideration of the Application, the Court of Appeals held that A&K could only be compensated to the extent its "services represented an identifiable, tangible, and material benefit to the estate." *Pro-Snax,* 157 F.3d at 426. In so holding, the Court cited only one other decision, *In re Melp, Ltd.*, 179 B.R. 636 (E.D. Mo. 1995).[11]

*Pro-Snax*, though it can be read simply to require that benefit to the estate be reasonably foreseeable at the time a professional's services are performed,[12] has generally been viewed as

---

[11]     *Melp* was a case in which the court held that debtor's counsel could be compensated for services performed after appointment of a trustee. The *Melp* court distinguished between the standard to be applied in awarding fees to a chapter 11 debtor's counsel in the absence of a trustee and the standard applicable after a trustee's appointment. In the former context, an award of fees, according to the court, need only meet the tests set by section 330(a)(1). As to the latter context, the *Melp* court stated:

> However, when an operating trustee has been appointed, an additional threshold requirement applies beyond those listed in § 330(a). A debtor's attorney may recover fees despite the appointment of an operating trustee only if his or her services provided an identifiable, tangible, and material benefit to the estate.

(Quotation marks and citations omitted.)

[12]     While the *Pro-Snax* court stated that the test for compensation would be "whether A&K's services *resulted* in an identifiable, tangible, and material benefit to the bankruptcy estate," (157 F.3d at 426 (emphasis added)), so indicating any benefit must be evaluated after the fact, in explaining this standard in relation to a plan authored by A&K that never reached confirmation, the Court of Appeals stated:

> A&K should have known from the outset that the Debtor's prosecution of a Chapter 11 plan would fail, given that the Petitioning Creditors – who collectively held more than 50% of the indebtedness in this case – filed an involuntary *Chapter 7* case against the Debtor and repeatedly informed the Debtor and the bankruptcy court that they believed the case should be administered under Chapter 7.

(Emphasis in original.) This language, together with other comments of the Court, such as "at the time the services are performed [ ], the chances of success must outweigh the costs of [the services]" (*Id.*), suggests that *Pro-Snax* was more directed at a critical review of a professional's decision to pursue a given course than an assessment of actual value brought to the case through the professional's services.

8

requiring that the court evaluate the benefit of the services retrospectively.[13] Requiring an after-the-fact evaluation of the benefit brought to a case by a professional's work has been generally rejected by courts in other circuits.[14] Thus, while *Pro-Snax* is, of course, binding precedent for

---

[13]     *See* note 5, above.

[14]     Other Courts of Appeals which have addressed the issues raised in *Pro-Snax* have not adopted the "identifiable, tangible, and material benefit to the estate" standard. Rather, the leading view was voiced by the Second Circuit Court of Appeals in *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996), *abrogated on other grounds by Lamie*, 540 U.S. at 531, which employs a prospective analysis that considers whether the services were "reasonably likely to benefit the estate" at the time they were performed, and is an objective test based on the services that a reasonable lawyer would have performed in the same circumstances. *See In re Veltri Metal Prods., Inc.*, 189 Fed.Appx. 385, 389-90 (6th Cir. 2006) (applying the "reasonably likely to benefit the estate" standard and also concluding that the benefit to the estate need not be an economic one); *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co.(In re Mednet)*, 251 B.R. 103, 107 (9th Cir. BAP 2000) (adopting the objective, prospective test of *Ames*); *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131-32 (3d Cir. 2000) (applying a reasonableness standard) *abrogated on other grounds by Lamie,* 540 U.S. at 531; *In re Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995) (cited and followed in *Ames*), *abrogated on other grounds by Lamie*, 540 U.S. at 531.

The Court of Appeals for the Tenth Circuit has adopted a hybrid approach wherein services must both actually benefit the estate *and* be reasonably likely to benefit the estate at the time they are performed. *Jensen v. U.S. Tr. (In re Double J Cattle Co.)*, 226 B.R. 284 (Table), at *4-5 (10th Cir. BAP 1997). However, the *Double J* court explained that the benefit to the estate need not be limited to an economic approach and that other factors may be considered, limiting the practical effect of the requirement to perform a retrospective analysis.

The Bankruptcy Appellate Panel for the Eighth Circuit has implied that a retrospective test respecting compensation is inappropriate, but has not explicitly ruled on the issue. *See Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 608 (8th Cir. BAP 2003) (stating that "Section 330 contains no requirement that the attorneys' services benefit the estate."). Lower courts in the Eighth Circuit generally apply a prospective, reasonableness test similar to *Ames*, based however on the language of 11 U.S.C. § 330(a)(4)(A)(ii)(I) and (II). *See, e.g., In re Racing Servs., Inc.*, 2008 WL 822231, at *3 (Bankr. D.N.D. Mar. 26, 2008) (stating that "the Court shall not allow compensation if the services rendered were not reasonably likely to benefit the estate or were unnecessary for the administration of the estate.") (Citations omitted).

Courts of Appeals in the First, Fourth, Eleventh and D.C. Circuits have yet to adopt a position on the issue, though the clear trend among lower courts that have addressed the issue is to embrace a prospective analysis similar to *Ames. See, e.g., In re Ellipso, Inc.*, 462 B.R. 241, 252 (Bankr. D.D.C. 2011) (citing Second Circuit precedent and stating that "'courts objectively consider whether the services rendered were reasonably likely to benefit the estate from the perspective of the time when such services were rendered.'") (quoting *In re Value City Holdings, Inc.*, 436 B.R. 300, 305 (Bankr. S.D.N.Y. 2010)); *In re Vu*, 366 B.R. 511 (D. Md. 2007) (citing to *Ames* and *Mednet* and stating that "the benefit to the estate requirement under § 330 requires only that a reasonable attorney would have believed that the services were reasonably likely to benefit the estate at the time they were rendered."); *In re Jankowski*, 382 B.R. 533, 545 (Bankr. M.D. Fla. 2007) (stating that "[s]ection 330 of the Bankrutpcy Code 'requires only that the services in question had a reasonable likelihood of benefitting the estate at the time they were provided, not that they actually provide a benefit.'") (citing *In re Boyce*, 2006 WL 3061633, at *3 (E.D. Pa. 2006)); *In re Delta Petrol. (P.R.), Ltd.*, 193 B.R. 99, 108 (D. P.R. 1996) (affirming a bankruptcy court order

this court in the case at bar, the court believes it appropriate to perform its retrospective analysis of the Firm's work in a fashion that minimizes rather than maximizes differences in result between the Fifth and other circuits.[15]

### B. The *Pro-Snax* Problem

The problem posed by *Pro-Snax* is that use of the word "benefit" suggests a positive contribution is required. An "identifiable, tangible, and material" benefit to the estate at first blush would appear to be something that augments the estate. Yet it seems clear that professionals serving a debtor or other fiduciary in a chapter 11 case cannot be limited in their compensation to those activities that actually add to the estate. First, such a determination would exclude from compensation many critical functions performed by professionals in the course of a chapter 11 case. Administrative matters, operational oversight, disputes respecting control, steps in the plan process such as extensions of exclusivity and many other matters dealt with by professionals covered by *Pro-Snax* do not increase the debtor's estate or reduce the claims against it – yet the chapter 11 case could not work if professionals did not perform services in connection with these functions.

Second, as with the Firm's work, that work which a professional undertakes doesn't

---

allowing compensation of a chapter 11 trustee and stating that, by "negative implication," under §330(a)(4)(A)(ii)(I) and (II), "a bankruptcy judge may award compensation for services that were: reasonably likely to benefit the estate, necessary to its administration, or [*sic*] not unnecessarily duplicative.").

[15] Though each circuit has adopted different, though similar, language in formulating a test for when services rendered by a professional in a bankruptcy case should be compensable, courts should look to minimize rather than maximize the differences in those formulations. *See Jendusa-Nicolai v. Larsen*, --- F.3d ----, 2012 WL 1324245, at *2-3 (7th Cir. April 18, 2012) (suggesting that circuit conflicts are sometimes manufactured based on differently worded legal formulations).

This is consistent with the court's duty to maintain national uniformity in the bankruptcy laws. *See* U.S. CONST. ART. I, § 8, cl. 4; *see also In re Reese*, 91 F.3d 37, 39 (7th Cir. 1996) (noting that the requirement of uniformity was designed to prevent arbitrary regional differences in the nation's bankruptcy laws, and private bankruptcy litigation).

always lead to success.[16] Deals – as with SPOT – fall through. Litigation on behalf of the estate may offer the prospect of substantial recoveries, but will not necessarily be won. It may be that counsel representing Stern, the estate representative in *Stern v. Marshall*, --- U.S. ----, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), was unsuccessful, ultimately losing the estate's case in the United States Supreme Court in a 5-4 decision. It is unthinkable that that counsel's work leading to that result should be uncompensated.

The very fact that section 328(b) permits (but does not require) retention of professionals on, *inter alia*, a contingency basis demonstrates that Congress did not intend all professional services to be compensable only on that basis. Yet, as some courts have noted,[17] to apply *Pro-Snax* as requiring estate augmentation would be tantamount to doing so.[18]

The UST in the case at bar claims the Firm should not be paid because Debtors' estates did not benefit from the Firm's services. In so arguing, the UST seems to adopt the view that benefit to the estate should be taken at face value as requiring an accretion of value. The court disagrees.

### C. The Benefit Requirement

The Court of Appeals does not provide clear guidance in *Pro-Snax* respecting what is required to show an "identifiable, tangible, and material benefit," but the court can look to two different possible sources for direction.[19] First, *Pro-Snax* does cite *Melp*, which in turn provides

---

[16]   The *Pro-Snax* court even listed among the accomplishments of A&K that it apparently found worthy of compensation a settlement that did not consummate. *Pro-Snax*, 157 F.3d at 426.

[17]   *See* note 5, above.

[18]   To some extent a professional's compensation is always likely to be at risk, as professionals will not be paid in full if an estate proves administratively insolvent.

[19]   The Firm and Debtors argued at the Hearing that the Firm's work benefitted the estate by, for example, delaying pursuit of relief from the automatic stay of Code § 362(a) by Broughton's lender. The court is not

factors for determining whether an attorney's work provided an "identifiable, tangible, and material benefit to the estate." *Melp*, 179 B.R. at 640. Second, the court might utilize District Judge Jane Boyle's connection between the benefit test of *Pro-Snax* and the requirement of Code § 330(a)(1) that a professional's services be "actual" and "necessary." *See* section 330(a)(1); *Kaye v. Hughes & Luce, LLP, (In re Gadzooks, Inc.)*, 2007 WL 2059724, at *9 (N.D. Tex. Jul. 13, 2007).

### 1. *Melp*

*Melp* was cited by the *Pro-Snax* court in support of the proposition that, to warrant compensation, "any work performed by legal counsel on behalf of a debtor must be of material benefit to the estate." *Pro-Snax*, 157 F.3d at 426. In explaining how work should be assessed to determine whether a lawyer had provided "an identifiable, tangible, and material benefit," the *Melp* court stated:[20]

> In undertaking a "benefit analysis," a court should consider: (1) whether the debtor's attorney's actions duplicated the duties of the trustee or the trustee's counsel under 11 U.S.C. § 1106; (2) whether the services have in fact, obstructed or impeded the administration of the estate; and (3) whether the debtor's attorney's actions are consistent with the debtor's duties under 11 U.S.C. § 521.

---

prepared, however, at least on the record before it, to find that the collateral consequences of the Firm's work satisfy the benefit requirement established by the *Pro-Snax* court.

[20] The same factors have been applied by those cases cited in *Melp* as well as in other cases citing *Melp*. *See Pfeiffer v. Couch (In re Xebec)*, 147 B.R. 518, 523 (9th Cir. 1992) (cited in *Melp*); *In re Pine Valley Mach., Inc.*, 172 B.R. 481, 488 (Bankr. D. Mass. 1994) (cited in *Melp*, listing the second and third *Melp* factors, but also listing the following factors: 1) whether the services were rendered in good faith; 2) whether the services resulted in an actual benefit to the estate; 3) whether the services were rendered in the nature of transition); *In re Word of Faith Fellowship, Inc.*, 1997 WL 527852, at *6 (Bankr. N.D. Ill. 1997) (citing and adopting the *Melp* approach); *In re Stroudsberg Dyeing & Finishing Co.*, 209 B.R. 648 (Bankr. M.D. Pa. 1997) (citing *Melp* and other cases and adopting the same factors).

179 B.R. at 640. While, as noted above, the *Melp* court applied this test to determine whether a debtor's attorney could be paid for work done *after* appointment of a trustee,[21] these factors arguably represent – given the reliance of the *Pro-Snax* court on *Melp* – the factors the Court of Appeals considered important to deciding whether counsel's services have provided the benefit requisite to justify compensation.

Applying the *Melp* factors to the case at bar, the first factor appears to be tied to a trustee in place or about to be appointed. In other words, that counsel did work that the trustee or trustee's counsel would hypothetically perform pursuant to Code § 1106 is not the test;[22] rather it is whether the actual work performed by debtor's counsel duplicated work done or about to be done by the trustee or the trustee's counsel. As SPOT ultimately did not proceed with the purchase of the 22 lots and did not participate in the trustee's auction, the trustee did not do the same work as the Firm.[23] In the context in which *Pro-Snax* dictates the *Melp* factors be applied, the services of debtor's counsel, to be duplicative of the work of the trustee, must be more proximate in time to the trustee's tenure[24] and more similar to the work done by the trustee than is the case here.

---

[21] The cases cited in *Melp* (and those later citing *Melp*, other than *Pro-Snax*) also were cases in which the question was what compensation debtor's counsel should receive for work done *after* a trustee was appointed.

[22] The trustee's duties, other than that to investigate, are assigned to a debtor if the debtor is (as was the case here) in possession. Code § 1107(a).

[23] Had SPOT bid at the auction and been successful, the Firm's work would have been compensable to the extent the trustee used or built upon it to consummate the sale to SPOT.

[24] A trustee removed under section 1105 may have done work subsequently duplicated by counsel to the debtor returned to possession. Likewise, a trustee newly appointed pursuant to section 1104 or – as here – due to conversion to chapter 7 may undertake a project initially worked on by debtor's counsel where the trustee, rather than utilizing counsel's work, repeats steps previously taken. *Melp*, as applied under *Pro-Snax*, suggests that the trustee and his or her counsel – not the professionals of the former debtor in possession – should ordinarily be compensated for the duplicative effort.

As to the second *Melp* factor, the Firm's work neither obstructed nor impeded the administration of the estate.[25] Rather, the Firm provided services to Broughton in its role as debtor in possession consistent with the latter's duty to administer the estate. Indeed, the Firm's efforts were at the behest of Broughton acting as estate representative and pursuant to court order.

As to the final *Melp* factor, it is clear that, just as duplication of the trustee's duties cannot bar compensation for work done when no trustee is yet even in prospect and which work the trustee will not later be required to perform again, the reference to a debtor's duties under section 521 of the Code does not constitute a limit on that for which a professional working for a debtor in possession may be compensated. To read *Pro-Snax* and *Melp* to prevent compensation except for services rendered in furtherance of section 521 is to exclude a debtor's professionals from assisting the debtor in possession with its duties under Code §§ 1107, 1106, and 1108. Rather, once appointment of a trustee has been ordered, then the debtor and its counsel must limit their work in so far as possible, consistent with the debtor's remaining duties as estate representative, to that authorized by section 521. In the context of the Application, the court need only determine – and so finds – that the efforts of the Firm were in no way inconsistent with section 521. Thus, if *Melp* and similar cases are used to explain the requirements of *Pro-Snax*, Schmidt and the Firm meet those requirements and have shown the necessary benefit to the estate and the Application should be granted.

### 2. Actual and Necessary

The *Gadzooks* court, which applied the benefit test to counsel representing an equity committee, struggled with how to reconcile the *Pro-Snax* requirement of an "identifiable,

---

[25] The *Pro-Snax* court's concern with A&K's work on a plan creditors would never accept suggests a belief that A&K's efforts may indeed have interfered with or impeded efficient estate administration.

tangible, and material benefit" to the estate, including its suggestion of a retrospective review of counsel's work, with section 330(a)(3)(C) which indicate a professional's efforts should be assessed prospectively, as of the time they were to be performed. Judge Boyle, in *Gadzooks*, concluded that the requirement set by the Court of Appeals of a benefit to the estate constituted a gloss on the provision in section 330(a)(1)(A) that counsel be awarded "reasonable compensation for actual, necessary services rendered by the…professional person." *See In re Gadzooks*, 2007 WL 2059724, at *9. That is, services will benefit the estate if they are actual and necessary.[26]

As it happens, the term "actual, necessary" is found not only in section 330(a)(1)(A) but as well in section 503(b)(1)(A), where it modifies the words "costs and expenses of preserving the estate" and limits what costs and expenses are entitled to priority payment as administrative claims.[27]

As used in section 503(b)(1)(A), "actual, necessary" clearly does not mean administrative expenses are limited to only those that enhance or at least preserve a debtor's estate. It has been black letter law since the Supreme Court rendered its decision in *Reading Co. v. Brown*, 391 U.S. 471, 478, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), that torts committed by an estate representative in the course of performing his, her or its duties give rise to claims entitled to administrative

---

[26] The court does not understand that the UST contends that the Firm either did not in fact perform the services for which it seeks compensation or that the services performed were not appropriate to the assigned tasks. So long as the objective being pursued – the sale of SPOT – was valid, the services performed by the firm were necessary to achieving it.

[27] The relationship between the use of "actual, necessary" in section 503(b)(1) and its use in section 330(a)(1)(A) is further cemented by both section 503(b)(2), which subsumes section 330(a) and its "actual, necessary" requirement, and sections 503(b)(3) and (4), which also use the term "actual, necessary." It is reasonable that the term should be similarly construed in each of these contexts. *See Rousey v. Jacoway*, 544 U.S. 320, 326-27, 125 S.Ct. 1561, 161 L.Ed.2d 563 (2005) (looking at use of the phrase "on account of" in provisions of the Code other than the one at issue and adopting a consistent construction); *In re Trejos*, 352 B.R. 249, 257 (Bankr. D. Nev. 2006) (citing *Rousey* and stating that "the Supreme Court has acknowledged that with a code such as the Bankruptcy Code, similar words and phrases presumptively will receive the same construction, even if found in different parts of the code.").

priority.[28] This is because, as the Court reasoned in *Reading*, a bankruptcy estate, just like any other participant in the business world, must pay those costs necessarily incident to its operations, including satisfying claims arising from torts attributable to the estate.

Similar reasoning can be applied to the efforts of the professionals of a debtor in possession (or other statutory bankruptcy fiduciary). It is the duty of a debtor in possession – like any estate representative – to realize any possible value from assets of the estate. If it eventually proves true that an asset cannot be realized upon, that does not mean it should not be investigated and its liquidation (or other means of realization) pursued, so long as, as the *Pro-Snax* court observed, "the chances of success…outweigh the costs of pursuing the action." 157 F.3d at 426. Thus, for example, in *Stern v. Marshall*, pursuit of Stern's counterclaim was appropriate and compensable, since the chances of success were good. That the case ultimately was lost 5-4 in the Supreme Court (on the basis of the bankruptcy court's constitutional inability to enter a final judgment on Stern's counterclaim) does not change the fact that the estate representative and estate professionals were doing their duty in pursuing it.

The same can be said of the Firm's work. It was entirely appropriate for Broughton to pursue the transaction with SPOT. That the deal fell through does not mean the Firm should not be compensated – there was never any question that SPOT could perform or that the sale of the 22 lots would produce fair value for the estate; that the principals were difficult to deal with or that CHORA created obstacles is hardly reason for counsel charged with negotiating and documenting the deal to refuse to work to make the sale happen.

---

[28] Although *Reading* was decided under the former Bankruptcy Act, it remains good law under the Code. *See, e.g., Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 388 (5th Cir. 2001) (stating that "[t]he *Reading* exception has survived Congressional amendments to the bankruptcy code and been recognized and applied by nearly every Court of Appeals in the nation.") (Citations omitted).

Success cannot be a prerequisite to compensation outside of a contingency arrangement.[29] Rather, the conclusion that a professional was justifiably pursuing a legitimate, realizable goal of the fiduciary client should be enough benefit to the estate to satisfy *Pro-Snax*.

**IV. Conclusion**

The court today holds that a professional provides an "identifiable, tangible and material benefit" to a bankruptcy estate within the meaning of *Pro-Snax* through assisting the estate representative in administering an asset of the estate, whether or not the effect of administration of the asset is enhancement of the estate, so long as the professional's services are performed at the direction of the estate representative and the estate representative is acting in accordance with the Code and its sound business judgment.[30] In doing so, the court focuses on the nature of the benefit provided but also takes account of public policy and an estate representative's decision making authority in bankruptcy.

With regard to the latter, the court relies on an estate representative's sound business judgment in approving acts outside the ordinary course of business. *See Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (discussing the "sound business judgment" test for transactions outside the ordinary course of business); *In re Borders Group, Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011). Unless the manner in which an estate representative arrives at a decision is seriously flawed, the court will defer to the estate representative. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426, 427

---

[29] *See, e.g., In re Asarco LLC*, 2011 WL 2974957, at *21.

[30] As the court has indicated above, professionals' administrative work likely also confers benefit on the estate within the meaning of *Pro-Snax*, but it is not necessary to a ruling on the Application that the court so hold. Likewise the court need not here reach the question of whether committee professionals satisfy *Pro-Snax* when acting in the interests of the committee's constituents.

(Bankr. N.D. Tex. 2009). A professional should similarly be able to rely on its client's business judgment in acting in accordance with the client's instructions.

As to public policy, professionals are retained by an estate representative to advise and assist the representative in carrying out his, her or its duties under the Code.[31] To burden professionals by making their compensation contingent upon the result of the estate representative's decisions must necessarily skew the regime intended in the Code and will surely create conflicts where a professional believes its client's decision, though arrived at through due diligence, is not the right one. Had Congress wished professionals retained under section 327 of the Code to second-guess and perhaps veto decisions of a trustee or debtor in possession, it surely would have said so.

Based on the foregoing, the court concludes the Firm may, under the Code and *Pro-Snax*, be compensated. The Application is therefore approved in full and the Objection overruled.

It is so **ORDERED**.

### END OF MEMORANDUM OPINION AND ORDER ###

---

[31] Thus, section 327(a) provides that an estate representative "may employ…professional persons…to represent or assist the [estate representative] in carrying out its duties under the [the Code]."